UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ORECK HOLDINGS, LLC; ORECK
DIRECT, LLC; ORECK
MERCHANDISING, LLC; ORECK                     CIVIL ACTION
SALES, LLC; ORECK HOMECARE,
LLC; AND ORECK@HOME, LLC


VERSUS                                        NO: 05-0361


DYSON, INC.                                   SECTION: R(4)


**ORDER AND REASONS**

Before the Court are the submissions of plaintiff Oreck

Holdings, LLC and defendant Dyson, Inc. concerning the

construction of the disputed claim terms of U.S. Patent No.

5,016,315.  Also before the Court are the parties' cross motions

for summary judgment on Oreck's patent infringement claims.  For

the following reasons, the Court GRANTS Dyson's motion for

summary judgment of noninfringement and DENIES Oreck's motion for

summary judgment.

I.    **BACKGROUND**

Oreck and Dyson are well-known vacuum cleaner companies that compete in the national market.  Oreck Holdings, LLC filed this action against defendant Dyson, Inc. on February 10, 2005, alleging that Dyson's DC14 vacuum cleaner infringes Oreck's rights in U.S. Patent No. 5,016,315 (the "'315 patent").  The parties have briefed the disputed claim language of the '315 patent.  On the basis of their respective constructions of the disputed claims, Oreck and Dyson have each moved for summary judgment on Oreck's patent infringement claims.

A.    **History of the '315 Patent**

The '315 patent, titled  "Floor Cleaning Device with Improved Handle Grip," generally describes an upright floor cleaner, such as an upright vacuum cleaner, with an ergonomically designed grip that is intended to reduce the amount of force required when a user moves the cleaner across the floor.  *See generally* '315 Patent.[1]  The idea for what eventually became the '315 patent was first proposed at an October 1984 meeting between Oreck personnel, including David Oreck, the company's founder and

---

[1]Both parties attached the '315 patent as an exhibit to their claim construction briefs.  Throughout this order, citations to the '315 patent will be made in the following format:  '315 Patent at [column]:[line(s)].

president, and personnel of Bissell, Inc. *See* David Oreck Aff. ¶ 5. At that time, Oreck did not have a manufacturing facility of its own, and it did not have engineers on staff. *Id.* ¶ 3. Bissell manufactured all of Oreck's vacuum cleaners on a purchase order basis. *Id.* During this time period, Oreck and Bissell worked together closely in the process of designing and marketing vacuum cleaners. *Id.*

At the October 1984 meeting, David Oreck proposed a new type of handle that would make it easier for a user to push the vacuum cleaner across the floor. *Id.* ¶ 5 & Ex. A.; Brebner Decl. Ex. H. On April 23, 1985, Oreck personnel and Bissell personnel again discussed this new grip design, including the possibility of patenting the design. *See* David Oreck Aff. Ex. C, at 1-2. David Oreck was apparently dissatisfied with the discussion at the April 23, 1985 meeting. The next day, he wrote to Bissell that the idea for the new handle belonged to Oreck, not to Bissell. *See id.* Ex. A; Brebner Decl. Ex. H. In this letter, David Oreck asserted that the "entire approach was [his] original idea," that he "did not intend to abdicate [his] position of [sic] the originator of th[e] grip," and that he "would like this patent in [his] name." David Oreck Aff. Ex. A; Brebner Decl. Ex. H. On May 10, 1985, Bissell responded that it would apply for the patent on the new grip in its own name and that it would give

3

Oreck the exclusive right to use any patent that ultimately issued.  David Oreck Aff. Ex. B; Brebner Decl. Ex. I.

Bissell first applied for the '315 patent on November 1, 1985, as assignee of named inventors Susan G. Bledsoe and Gordon W. Goodrich, both Bissell employees.  The Patent and Trademark Office rejected the original application several times as unpatentable over the prior art.  *See generally* Brebner Decl. Ex. AA.  Bissell filed a continuation application on November 24, 1997.  The PTO also rejected the continuation application several times, but the '315 patent was ultimately issued on May 21, 1991. *See generally id.* Ex. BB.

Oreck was undoubtedly aware that Bissell had applied for the '315 patent and had listed its own employees as the named inventors.  *See* David Oreck Aff. ¶ 12 ("I was aware that the invention was being prosecuted by Bissell in the name of its engineers.").  Indeed, David Oreck's brother, Marshall Oreck, an Oreck executive vice president, submitted an affidavit to the PTO in support of Bissell's application for the '315 patent.  *See* Brebner Decl. Ex. AA(7).

In or about October 1997, the relationship between Oreck and Bissell began to deteriorate, at least in part because Oreck informed Bissell that it would begin to manufacture its own vacuum cleaners.  *See* David Oreck Aff. ¶ 15.  As the relationship

4

unraveled, the ownership and/or inventorship of the '315 patent became a particular point of contention, as each party claimed rightful ownership of the '315 patent.  *See id.* Exs. F-J.  The disputes between Oreck and Bissell ultimately ripened into litigation.  On October 17, 1997, Bissell sued Oreck in the United States District Court for the Western District of Michigan.  In its answer in that action, Oreck asserted that Oreck "invented and conceived" the '315 patent and that it was the true owner of the patent.  *See* Brebner Decl. Ex. J, ¶¶ 30-32.  Around the same time, Oreck sued Bissell in this district.  *See id*. Ex. K.  Oreck again asserted that it was the true owner of the '315 patent, but it also alleged, in the alternative, that the '315 patent was invalid and unenforceable "because Bissell applied for the patents in the name of the incorrect inventor and did so with deceptive intention."  *Id*. Ex. K, ¶ 27.  Both of those lawsuits resulted in a settlement, under which Bissell assigned the '315 patent to Oreck.  *See* David Oreck Aff. ¶ 17.

## B.    Claims of the '315 Patent

As noted above, the '315 patent describes an upright floor cleaning device with a handle grip designed to reduce the amount of force required for a user to move the cleaner across the floor.  *See* '315 Patent at 1:47-49.  The invention was intended

5

"to provide a handle grip for an upright floor cleaning device . . . wherein the operator's wrist is disposed in a substantially stronger position than in the known upright cleaning devices. . . . [and] to provide a handle grip which permits the pivoting handle to be positioned at a smaller acute angle to the floor during use." *Id.* at 1:40-47.

The specification describes an upright cleaner that includes "a base unit which is reciprocable over the floor by a standing operator, who manipulates the device through an elongated handle which is pivotable on the base unit, and thus relative to the floor during use." *Id.* at 1:14-17.  The cleaner has a handle grip that contains "a generally straight first portion which is essentially coaxial with the pivotable elongated handle of the cleaning device and which . . . forms an extension of the handle." *Id.* at 1:51-54.  This portion of the handle grip "connects with a second grip portion which comprises an arm which is graspable by the operator, with the arm extending forwardly (upwardly when in use) of the handle." *Id.* at 1:55-59.  The far end of the graspable arm "merges into a third grip portion which forms a brace extending diagonally rearwardly (downwardly when in use) back to and connecting with the first grip portion." *Id.* at 1:68-2:3.

6

The claimed advantage of this handle grip configuration is
that the operator's "fingers are arrayed normal to the pivotable
handle and at an obtuse angle to the axles, thus creating a
stronger wrist position [than under the prior art]." *Id.* at 2:8-
10.  With the handle grip in this position, "the forces applied
to move [the] cleaning device" are transmitted "down the
operator's arm and directly through the wrist in such a manner
that the wrist is not apt to bend, resulting in a strong wrist
position." *Id.* at 3:56-61.

The '315 patent contains eight claims.  Claim 1, the only
independent claim,[2] is set forth below with disputed claim terms
set out in bold and italics:

> 1.   An upright floor cleaner comprising in
>      combination:
>
> (a) a ***base unit*** for reciprocable translation
> over a floor to be cleaned,
>
> (b) wheel means mounted on axle means and
> ***adapted to support*** said base unit on said
> floor,
>
> (c) an elongated handle pivotally mounted at
> its inner end to said base unit and thus
> pivotable relative to said base unit and to
> said floor during said translation, said

---

[2]An independent patent claim is one that is "completely
self-contained."  Herbert F. Schwartz, Fed. Judicial Ctr., Patent
Law & Practice 12 (2d ed. 1995).  A dependent claim, by contrast,
refers to and incorporates the limitations of another claim.  *Id.*
Claims 2-8 of the '315 patent are all dependent claims.

handle being sufficiently long that said
floor cleaner can be manipulated by a user in
a standing position when said base unit is
engaging the floor,

(d) a handle grip **mounted on** the outer end of
said handle **forming a straight extension** of
said handle and mounted for movement with
said handle during use in a plane disposed
vertically to a said floor and normal to said
axle means,

(e) said handle grip including a graspable
arm attached to the outer end of said handle
grip and **extending** generally laterally
upwardly in a direction away from the floor
when in use and **at substantially a right
angle** with respect to the longitudinal axis
of said handle during use and being graspable
by the hand of a standing operator,

(f) said arm being sufficiently long in a
direction generally laterally and upwardly
away from said handle that it will
accommodate the width of a user's hand
grasping said arm, so that **the forces applied
by the said standing operator to translate
the device over the floor are applied
generally parallel to the operator's fingers**
to thereby provide a **strong wrist position**
for the operator during said reciprocable
translation, and so that said arm positions
said handle below the operator's hand to
thereby minimize the angle of said handle
relative to said floor during use.

*Id.* at 4:15-51 (emphasis added).  Figures 1 and 2 below, which

are reproduced from the '315 patent, illustrate the preferred

embodiment of the invention.

8



**Fig. 1** ('315 Patent,
Fig. 6)



**Fig. 2** ('315 Patent,
Fig. 2)

Dependent claims 2 through 8 disclose specific variations of
the cleaner claimed in independent claim 1.  Of particular
relevance to the current motions is dependent claim 7.  Claim 7
discloses: "The upright floor cleaner of claim 1 in which said
arm *curves forwardly slightly* towards said base unit as it
proceeds upwardly away from said longitudinal axis of said
handle."  '315 Patent at 6:3-6 (disputed claim terms in bold and
italics).

## II.  CLAIM CONSTRUCTION

Patent infringement analysis consists of two steps.  The
trial court must first determine the correct meaning and scope of
the patent claims, and it must then compare the correctly
construed claims to the allegedly infringing device.  *See Playtex
Prods., Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 905-06 (Fed.

9

Cir. 2005); *Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1322 (Fed. Cir. 2003). The first of these steps, claim construction, is a question of law to be determined by the court. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996)). The court must determine the meaning of claim terms independently, without reference to the accused infringing device. *See Neomagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002).

Claim construction generally requires that the words of the claims be given their "ordinary and customary meaning," which is the meaning the terms "would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). In some cases, the ordinary and customary meaning of a claim term "may be readily apparent even to lay judges." *Id.* at 1314. On such occasions, claim construction requires "little more than the application of the widely accepted meaning of commonly understood words." *Id.* When the construction of claim terms depends solely on the interpretation of common words, ordinary, general purpose dictionaries may assist the court in ascertaining the correct construction of the claims. *Id.*

10

When the claim terms at issue are not so readily susceptible to interpretation, a court should "look[] to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," such as "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova*, 381 F.3d at 1116; *see also Phillips*, 415 F.3d at 1314 ("In many cases that give rise to litigation, . . . determining the ordinary and customary meaning of a claim requires examination of terms that have a particular meaning in a field of art.").

These sources are not, as a general matter, of equal value. A claim construction analysis must begin with the "bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled to exclude." *Innova*, 381 F.3d at 1115 (citing *Aro Mfg., Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961)). The analysis should therefore "begin and remain centered on the claim language itself." *Id.* Even when the disputed claim terms are themselves unclear or ambiguous, other aspects of the claim language, such as the context in which the disputed term is used or the different limitations contained in the asserted claims, can be

11

valuable sources of information as to the correct meaning of the disputed terms.  *See Phillips*, 415 F.3d at 1314-15.  For example, the inclusion of a particular limitation in a dependent claim creates a presumption that the limitation is not contained in the independent claim upon which the dependent claim is based.  *Id*.

When the court cannot determine the correct meaning of claim terms solely by reference to the claim language, it should next consider other intrinsic evidence, in the form of (i) the written description, or specification, that accompanies the patent claims and (ii) the patent's prosecution history (*i.e.*, the record of the proceedings before the PTO).  The written specification is a part of the patent document itself, so the patent claims should, if at all possible, be construed as consistent with the specification.  *Playtex*, 400 F.3d at 906; *see also Phillips*, 415 F.3d at 1315 ("[T]he specification 'is always highly relevant to the claim construction analysis.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  The court can use the specification only to inform its construction of the claim terms; the court cannot use the specification to read additional limitations into the claim or to otherwise alter the claim terms.  *See Playtex*, 400 F.3d at 906 (court "must use the written description for enlightenment and not to read a limitation from the specification"); *Innova*, 381 F.3d at 1117

12

("The longstanding difficulty is the contrasting nature of the axioms that (a) a claim must be read in view of the specification and (b) a court may not read a limitation into a claim from the specification."); *see also White v. Dunbar*, 119 U.S. 47, 51-52 (1886) (court may resort to context "for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what it is"). Although the prosecution history is not ordinarily as useful as the specification, the court can consider it if it is in evidence, as the prosecution history may shed light on how the inventor and the PTO understood the scope of the invention. *See Phillips*, 415 F.3d at 1317; *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1307 (Fed. Cir. 2003).

Finally, a court also has discretion to admit and to consider extrinsic evidence, including dictionaries, treatises and expert testimony, to assist it in the claim construction process, though such evidence is generally less reliable and less probative than intrinsic evidence. *See Phillips*, 415 F.3d at 1317-19.

The Court considers the disputed claims of the '315 patent in accordance with these principles.

13

A.   **Claim 1(a) – "Base Unit"**

Claim 1(a) describes an upright floor cleaner containing "**a base unit** for reciprocable translation over a floor to be cleaned." '315 Patent at 4:17-18.  The parties dispute whether the "base unit" so described must include the entirety of the device's cleaning mechanism.  Dyson argues that the term "base unit" should be construed as "the main part of the floor cleaner's cleaning mechanism (which includes, among other things, the motor, fan, and brushbar) that constitutes the preponderance of the weight of the vacuum cleaner and . . . carries the rest of the cleaner along the floor." *See* Joint Claim Constr. Statement at A-1.  Oreck, by contrast, asserts that "base unit" refers only to the head, or nozzle, of an upright cleaner and "can be defined as the place into which the dirt or debris is suctioned or swept." *See id.*  Under Oreck's proposed construction, the base unit of an upright vacuum cleaner described by the '315 patent can, but need not, include parts such as the motor and fan.

Neither party suggests that the term "base unit" has a specialized meaning to people experienced in the art, and "base unit" is not defined in either the patent claims or the specification.  The specification does, however, contain several descriptive references to the term "base unit."  The description of the preferred embodiment states that "[t]he *floor cleaning*

14

*mechanism disposed within* the housing of base unit 2 is not shown but may be of any conventional well-known type." '315 Patent at 2:47-50 (emphasis added). Similarly, the specification later refers to "the cleaning mechanism of base unit 2." *Id.* at 2:57-58. These statements evidence that the inventors intended the term "base unit" to mean that portion of the cleaning device that contains the device's cleaning mechanism. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1251-52 (Fed. Cir. 1998) (looking to specification for evidence as to intended definition of claim term). Moreover, nothing in the patent claims or the specification suggests that any portion of the cleaning mechanism could be located anywhere but in the base unit. In light of the intrinsic evidence available to the Court of the meaning intended by the inventors, the Court finds that a person of ordinary skill in the art at the time of the invention would understand the term "base unit," as used in the '315 patent, to mean the portion of an upright floor cleaner that contains the device's cleaning mechanism.[3]

---

[3]Oreck inadvertently supports this construction in its claim construction brief. Referring to Dyson's product, Oreck states that the DC14 is "unusual in that its motor and suction fan are not located within the nozzle assembly, as is customary." Oreck Claim Constr. Mem. at 5 n.4. This statement implies that it is, in fact, "customary" for an upright vacuum cleaner to have the motor and fan included within the same apparatus as the nozzle of the cleaner, which suggests that a person of ordinary skill in

Oreck attempts to minimize the significance of the term "base unit" to the '315 patent.  It asserts that the claims and the specification simply "assume" that any upright cleaner will have a "base unit;" that "the '315 patent is not concerned with fans and motors;" and that "this claim element does not constitute an invention."  Oreck Claim Constr. Mem. at 3; Oreck Supp. Mem. at 8.  Although these might be accurate statements, they are not grounds for disregarding what the Court has determined is the ordinary meaning of the term "base unit."  A "base unit" is one of the express structural limitations of the patent claims, and the Court cannot dismiss that limitation as unimportant or immaterial simply because it was not the primary focus of the invention.  *See, e.g., Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would . . . leav[e] examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration."); *Techsearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1373 (Fed. Cir.

---

the art at the time of the invention would understand the nozzle assembly, or "base unit," of such a device to contain the entire cleaning mechanism, including the motor and fan.

2002) ("We have . . . recognized that specific claim limitations cannot be ignored as insignificant or immaterial in determining infringement.").

The Court therefore finds that the term "base unit" in claim 1(a) means that part of the floor cleaner that contains the device's cleaning mechanism.

### B.    Claim 1(b) – "Adapted to Support"

Claim 1(b) requires "wheel means mounted on axle means and *adapted to support* said base unit on said floor."  '315 Patent at 4:17-18.  The parties agree that the described wheel means must support, or hold the weight of, the base unit so that the base unit can move across a floor to be cleaned.  Although Dyson's proposed construction requires that the wheels carry the *entire* weight of the base unit and Oreck's proposed construction omits that term, the parties' submissions make it apparent that their disagreement has less to do with the correct construction of the phrase "adapted to support" than it does with their competing constructions of the term "base unit," an issue that the Court has already resolved.  In any event, Oreck concedes in its claim construction brief that Dyson's proposed construction is "acceptable as written."  Oreck Claim Constr. Mem. at 7.  Accordingly, the Court construes "adapted to support" to mean

17

that the wheel means of the cleaner must support the entire weight of the base unit on the floor.

### C.   Claim 1(d) – "Mounted On" and "Forming a Straight Extension"

Claim 1(d) describes a "handle grip ***mounted on*** the outer end" of the elongated handle and "***forming a straight extension*** of said handle."  With respect to the term "mounted on," the Court cannot perceive any definitional difference between the parties' constructions.  Oreck and Dyson both assert that the handle grip must be both separate from, and attached to, the elongated handle.  *See* Joint Claim Constr. Statement at A-2.    The parties differ somewhat as to the proper construction of the limitation that the handle grip form "a straight extension" of the elongated handle.  Oreck argues that this limitation simply requires that the handle grip be coaxial[4] with "the upper end" of the elongated handle.  *See* Joint Claim Constr. Statement at A-2. Dyson asserts that the handle grip must be coaxial to the

---

[4]Although the parties voiced some apparent disagreement concerning whether the handle grip must form a "coaxial" or "essentially coaxial" extension, both parties recognize that the inclusion of the qualifier "essentially" in the specification indicates that the limitation permits some minor deviation from perfect straightness.  *See* Dyson Claim Constr. Mem. at 13 ("Dyson concedes that the claims do not require that the 'handle grip' be coaxial with the handle to a Euclidean ideal of straightness . . . .").

entirety of the elongated handle, not simply its upper end.  *See*
Dyson Claim Constr. Mem. at 13.

The claim language itself, which refers only to a straight
extension of the "handle," is ambiguous as to whether the grip
must form a straight extension of the entire handle or whether it
must simply extend straight from the handle's upper end.
Although the claim refers to the "handle," rather than the upper
end of the handle, this language does not compel Dyson's
construction, as it is perfectly possible to have a separate,
straight extension of something that is not itself perfectly
straight.  Moreover, the language of the specification actually
supports Oreck's proposed construction.  *See* '315 Patent at 2:68-
3:3 ("The first grip portion 12 is generally straight and in the
present embodiment . . . essentially forms an axial extension of
the *upper or outer end* of handle 6.") (emphasis added).  The
Court also notes that the practical effect of Dyson's
construction would be to impose an additional limitation that the
elongated handle itself be completely straight along its entire
length, a limitation that does not otherwise appear in the claim
language.

The Court therefore finds that claim 1(d) requires only that
the first portion of the handle grip form an essentially coaxial
extension of the upper end of the elongated handle.

19

**D.   Claim 1(e) – "At Substantially a Right Angle"**

Claim 1(e) provides that the handle grip must include

> a graspable arm attached to the outer end of
> said handle grip and **_extending_** generally
> laterally upwardly in a direction away from
> the floor when in use and **_at substantially a_**
> **_right angle_** with respect to the longitudinal
> axis of said handle during use and being
> graspable by the hand of a standing operator.

'315 Patent at 4:33-38.  Dyson asserts that this limitation

requires that the graspable arm of the device be at an angle at

or near 90 degrees to the longitudinal axis of the handle.  *See*

Joint Claim Constr. Statement at A-2.  Oreck proposes a

functional construction and states that "a substantial right

angle will exist where the graspable arm is above the handle and

the user can grasp it in such a way that he or she will have a

strong wrist position, that is, one in which the forearm, hand,

and fingers are aligned in a strong position."  *Id.*

It is beyond dispute that the plain and ordinary meaning of

the term "right angle" is an angle of 90 degrees.  The term

"right angle" in claim 1(e) is modified, however, by the term

"substantially."  In the context in which it is employed here,

"substantially" is a term of approximation.  *See Anchor Wall*

*Sys.*, 340 F.3d at 1310-11; *Cordis Corp. v. Medtronic AVE, Inc.*,

339 F.3d 1352, 1360 (Fed. Cir. 2003); *see also Deering*, 347 F.3d

at 1323 (noting that "substantially" can be either a term of

approximation or a term of magnitude).  Terms of approximation
such as "substantially" are frequently included in patent claims
and are generally used to "'avoid a strict numerical boundary to
the specified parameter.'" *Ecolab, Inc. v. Envirochem, Inc.*, 264
F.3d 1358, 1367 (Fed. Cir. 2001) (quoting *Pall Corp. v. Micron
Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995)); *Playtex*,
400 F.3d at 907 (noting that "substantial" should not be
interpreted to incorporate a "strict numerical limitation"); *see
also Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed.
Cir. 2002) ("Expressions such as 'substantially' are used in
patent documents . . . in order to accommodate the minor
variations that may be appropriate to secure the invention."). 
Thus, the phrase "at substantially a right angle" in claim 1(e)
should be construed to mean that the graspable arm of the handle
grip must extend at an angle of at or near 90 degrees to the
longitudinal axis of the handle.  *See Cordis*, 339 F.3d at 1360
("substantially uniform thickness" interpreted to mean "of
largely or approximately uniform thickness"); *York Prods., Inc.
v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1573 (Fed.
Cir. 1996) ("substantial part of the entire height" construed to
mean "nearly the entire height"); *Amhil Enters. Ltd. v. Wawa,
Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996) ("substantially
vertical" construed to permit deviation "only slightly, if at

all, from the vertical").

Oreck interprets the phrase "at substantially a right angle" as a wholly functional limitation that can be defined only by reference to the "strong wrist position" of the user while he or she operates the device.  This construction fails for at least two reasons.  First, the requirement that the graspable arm extend "at substantially a right angle" is a clear structural limitation on the claim.  Oreck's proposed construction would impermissibly read this structural limitation out of the claim and render the claim language essentially meaningless.  *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) (rejecting functional interpretation that would "effectively expunge" specific claim limitation); *York Prods.*, 99 F.3d at 1573 (rejecting functional argument when "the claim language explicitly ties 'substantial part' to the height of the sidewalls, not to the overall function of the invention").  Second, claim 1(f) already contains the limitation that the graspable arm be such that it "provide a strong wrist position for the operator."  '315 Patent at 4:46-47.  It would make little sense to redefine an unambiguous structural limitation to simply duplicate a functional limitation that also appears in the claim language.  *See K-2*, 191 F.3d at 1363.

22

Oreck also argues that the graspable arm need not extend its entire length "at substantially a right angle," but rather that only some initial portion of the arm must be at substantially a right angle to the longitudinal axis of the handle.  Oreck argues that a construction of claim 1(e) that required that the graspable arm extend its full length at an angle at or near 90 degrees would exclude claim 7, which describes a cleaner with a graspable arm that "curves forwardly slightly" toward the base unit as it proceeds away from the longitudinal axis of the handle.  '315 Patent at 6:3-6.

Dyson responds that Oreck's proposed construction would effectively read the "at substantially a right angle" limitation out of claim 1(e), because it would permit the limitation to be satisfied by a device in which only some tiny fraction of the graspable arm is at or near a 90-degree angle to the elongated handle.

The Court is not persuaded that only the initial portion of the arm must be at or near a 90-degree angle to the longitudinal axis of the handle.  First, nothing intrinsic to the claim language compels Oreck's proposed construction, and if the inventors had intended to require only that the graspable arm initially extend, or begin to extend, at substantially a right angle to the handle, they certainly could have included such

23

language in the patent claims.  But they did not.  Instead, claim 1(e) simply requires "a graspable arm . . . extending . . . at substantially a right angle with respect to the longitudinal axis" of the handle, which would appear to contemplate, at the very least, that the "graspable" portion of the arm be at or near a 90-degree angle to the handle.

This construction is confirmed when claims 1(e) and 1(f) are read together.  Claim 1(e) describes the orientation of the graspable arm in relation to the elongated handle.  It requires that the graspable arm extend "generally laterally upwardly" from the handle.  '315 Patent at 4:35.  This otherwise vaguely-defined limitation is narrowed and made precise by the language that immediately follows it.  That language, which was added to claim 1(e) as part of an examiner's amendment shortly before the '315 patent was approved,[5] clarifies that the graspable arm must extend "in a direction away from the floor when in use and at substantially a right angle with respect to the longitudinal axis of [the elongated] handle."  '315 Patent at 4:35-38.  Claim 1(f) then describes the distance for which the graspable arm must extend from the handle in this generally lateral upward direction.  It states that the graspable arm must be

_____

[5]*See* Brebner Decl. Ex. BB(21).

24

"sufficiently long in a direction generally laterally and upwardly away from said handle that it will accommodate the width of a user's hand grasping said arm." *Id.* at 4:40-43.  Read together, these requirements establish two, complementary limitations:  (i) that the graspable arm must extend from the elongated handle in a specific direction (*i.e.*, "away from the floor when in use and at substantially a right angle with respect to the longitudinal axis of [the elongated] handle"); and (ii) that it must do so for at least a specified distance (*i.e.*, "sufficiently long . . . that it will accommodate the width of a user's hand grasping said arm").[6]

Nor is Oreck's proposed construction necessary to give meaning to claim 7, which permits the graspable arm to "curve[] forwardly slightly towards said base unit as it proceeds upwardly away from said longitudinal axis of said handle." '315 Patent at 6:4-6.  Oreck's argument incorrectly assumes that there is some fundamental inconsistency between a graspable arm that curves

_____

[6]The slight difference in phrasing ("generally laterally upwardly" in claim 1(e), and "generally laterally and upwardly" in claim 1(f)) does not alter this construction.  In this context, a person of reasonable skill in the art would interpret the phrase "generally laterally and upwardly" in claim 1(f) in light of the specific narrowing language that applies to "generally laterally upwardly" in the immediately preceding claim 1(e).

"slightly," *i.e.*, a small amount,[7] and one that extends "at or near" a right angle.  There is not.  An object can both curve slightly and still be at or near a 90-degree angle relative to another object.

Accordingly, the Court finds that the graspable arm of a device that meets the limitations of the '315 patent must be at or near a 90-degree angle with respect to the longitudinal axis of the cleaner's elongated handle for a distance sufficient to accommodate the width of a user's hand.

Finally, Oreck argues that, based on the figures depicted in the patent documents, the phrase "at substantially a right angle" must be construed to include, at a minimum, all angles between 60 degrees and 110 degrees.  To arrive at these numbers, Oreck points to figure 2 of the '315 patent, which portrays a graspable arm that "is bowed or curved from its point of anchorage with the first grip portion to its opposite end."  '315 Patent at 1:62-64. Oreck has measured the angles relative to the longitudinal axis of the handle created by tangents to the curved outer surface of the graspable arm at its near and far ends, and it calculates

---

[7]*See infra* part II.F.



**Fig. 3** (Aghazadeh Aff. Ex. B)

those angles to be 110 degrees and 60 degrees, respectively.  *See* Fig. 3 (Aghazadeh Aff. Ex. B).  Oreck then asserts, invoking the principle that claim limitations should not be construed in a way that would exclude the depicted embodiment of the invention, that these angles necessarily constitute "substantially" right angles within the meaning of claim 1(e).  Oreck further asserts that it is appropriate to measure the angle of the graspable arm by reference to the outer edge of the arm because the angle at which a user grasps the arm is dictated by the angle of the arm's outer edge.  *See* Oreck Supp. Mem. at 7 n.7.

This argument misses the mark.  First, the language of claim 1(e) requires only that the "graspable arm" extend outward from the longitudinal axis of the handle "at substantially a right angle."  '315 Patent at 4:33-37.  The claim makes no reference to whether the outer edge of the arm is straight, bowed or otherwise.  The most natural reading of claim 1(e) is that the limitation should be read with reference to the angle of the arm itself, and not its edges, at the point or points at which it is likely to be grasped by a user's hand.  In any event, even were it appropriate to measure the angle of the graspable arm with

27

reference to its outside edge, Oreck's proffered measurements
would still be irrelevant to the proper construction of the
claim.  The 60-degree and 110-degree angles that Oreck refers to
are measured from points at the ends of the graspable arm
depicted in figure 2, points at which it is unlikely that a user
would actually grasp the arm.

**E.   Claim 1(f) – "Generally parallel"/"Strong Wrist
      Position"**

Claim 1(f) requires that the graspable arm of the handle
grip be of sufficient length to accommodate the width of a user's
hand "so that the forces applied by the said standing operator to
translate the device over the floor are applied ***generally
parallel*** to the operator's fingers to thereby provide a ***strong
wrist position*** for the operator."  '315 Patent at 4:43-47.
Although the parties list the phrases "generally parallel" and
"strong wrist position" as disputed claim terms, the Court
discerns no significant differences between the parties' proposed
constructions.  Both Oreck and Dyson assert that the phrase
"generally parallel" is a term of approximation, meaning that the
forces applied by the user are approximately parallel to the
direction of the user's fingers, if extended and aligned with the
wrist and forearm.  Similarly, both Oreck and Dyson agree that

28

the ordinary meaning of "strong wrist position" as used in the
'315 patent is one in which the user's forearm, wrist, and hand
are aligned and unlikely to bend.

**F.   Claim 7 – "Curves Forward Slightly"**

Claim 7 describes "[t]he upright cleaner of claim 1 in which
said [graspable] arm *curves forwardly slightly* towards said base
unit as it proceeds upwardly away from said longitudinal axis of
said handle."

The parties agree that claim 7's limitation that the arm
"curves forwardly slightly" means that the arm can have a small
amount of curvature.  The only difference between the parties'
proposed constructions is that Oreck refers to a small curvature
"that is designed to be easily grasped by the hand."  Joint Claim
Constr. Statement at A-4.  Oreck argues that this additional
detail is justified by reference to the specification, which
states that the "rounded compound curvature of arm surface 16 . .
. is also helpful in that it tends to nest in the cupped inner
portion 27 of the operator's closed hand 28 when arm 15 is
grasped."  '315 Patent at 4:4-8.  But the language Oreck quotes
does not purport to describe the slight curve contemplated by
claim 7.  Rather, as is clear from figures 3 and 7 of the '315
patent, the "rounded compound curvature of arm surface 16" to

which the specification refers is the "curved outer rear surface"
disclosed by claim two.  This statement from the specification
therefore has no relation to curvature along the length of the
graspable arm, as described by claim 7.  Accordingly, Oreck's
additional language is unnecessary.  The Court therefore
construes claim 7 as simply permitting the graspable arm to have
a small curvature along its length in the direction of the base
unit.


III. SUMMARY JUDGMENT

    A.    **Legal Standard**

    Summary judgment is appropriate only when the pleadings and
summary judgment evidence establish that there are no genuine
issues of material fact and that the moving party is entitled to
judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court must be
satisfied that no reasonable trier of fact could find for the
nonmoving party or, in other words, "that the evidence favoring
the nonmoving party is insufficient to enable a reasonable jury
to return a verdict in her favor." *Lavespere v. Niagara Mach. &
Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The
moving party has the burden of showing that there are no genuine

issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

### B.    Validity and Enforceability of the '315 Patent

Dyson first argues that the '315 Patent is invalid and unenforceable because the patent was issued in the name of the incorrect inventors and because Bissell engaged in inequitable conduct before the PTO. Nonjoinder or misjoinder of an actual inventor can render a patent invalid. *See Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1338 (Fed. Cir. 2005); *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349-50 (Fed. Cir. 1998) ("Thus, [35 U.S.C. § 102(f)] . . . makes the naming of the correct

inventor or inventors a condition of patentability; failure to name them renders a patent invalid."). Although 35 U.S.C. § 256 provides that the failure to name an actual inventor can be cured in certain circumstances, that cure provision is inapplicable if the patentee's failure to name the actual inventor was the result of "deceptive intention." *See* 35 U.S.C. § 256 (providing that PTO may correct error in naming inventor if "such error arose without any deceptive intention").

Similarly, a patentee's "inequitable conduct" before the PTO can also render a patent invalid. *See Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1186 (Fed. Cir. 2006). Inequitable conduct will be found when a patentee misrepresents or fails to disclose material information to the PTO, and the evidence establishes an intent to mislead the PTO. *See id.* at 1186-87; *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318-19 (Fed. Cir. 2000). Inventorship is material for purposes of an inequitable conduct analysis. *See Perseptive Biosystems*, 225 F.3d at 1321.

To succeed under either of these tests, the party challenging the patent's validity must prove by clear and convincing evidence the underlying facts that establish that the patentee failed to name an actual inventor or otherwise engaged in inequitable conduct. *See Ferring*, 437 F.3d at 1186 ("The

predicate facts [of inequitable conduct] must be proven by clear and convincing evidence."); *Checkpoint Sys.*, 412 F.3d at 1338 (nonjoinder of inventor must be "'proved by clear and convincing evidence'") (quoting *Pannu*, 155 F.3d at 1349).

Dyson bases its argument that the '315 patent is invalid on (1) various statements in the record by David Oreck that he conceived the original idea behind the '315 patent and (2) alleged admissions by Oreck in its lawsuits against Bissell. The Court finds that Dyson has not satisfied its burden of establishing either a failure to name an actual inventor or inequitable conduct by clear and convincing evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-55 (1986) (court must consider underlying standard of proof on motion for summary judgment). Dyson is correct that the record contains a number of statements by David Oreck to the effect that he conceived of what became the '315 patent. *See, e.g.,* David Oreck Aff. Exs. A, H, J. This evidence is certainly sufficient to raise questions as to whether David Oreck should have been listed as an inventor on the '315 patent. But many of these statements are conclusory, and there is also evidence in the record that would tend to show that David Oreck was not the inventor, such as (i) David Oreck's affidavit in this litigation; (ii) the minutes of the April 23, 1985 meeting between Oreck and Bissell, at which

33

Bissell personnel discussed their progress on the new grip design; and (iii) the September 3, 1985 memorandum concerning the benefits of the new grip design from Bissell employee Susan Bledsoe.  In addition, that Oreck acquiesced in Bissell's claims of inventorship from May 1985 until late 1997 certainly casts doubt on whether David Oreck actually believed that he was the actual inventor of the '315 patent.  Moreover, Oreck at least tacitly supported Bissell's prosecution of the '315 patent, as is evidenced by Marshall Oreck's affidavit to the PTO.  *See* Brebner Decl. Ex. AA(7).  Given this conflicting evidence, the Court finds that Dyson has not established that it is entitled to summary judgment that the '315 patent is invalid or unenforceable.

Nor do Oreck's "admissions" on these issues render summary judgment appropriate.  Even assuming, as Dyson urges, that Oreck's earlier statements, taken from pleadings and affidavits related to litigation between Oreck and Bissell, qualify as judicial admissions, they would not be binding on Oreck in this case.  *See Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 329 (5th Cir. 2001) ("'[J]udicial admissions are not conclusive and binding in a separate case from the one in which the admissions are made.'") (quoting *Universal Am. Barge Corp. v. J-Chem.*, 946 F.2d 1131, 1142 (5th Cir. 1991)).  At most, Oreck's statements

constitute nonbinding, evidentiary admissions in this litigation. In light of the conflicting evidence referred to above, however, these purported admissions are insufficient to establish that Dyson is entitled to summary judgment that the '315 patent is invalid.

### C.   Infringement

Oreck and Dyson have filed cross motions for summary judgment on the issue of whether Dyson's DC14 vacuum cleaner infringes Oreck's '315 patent.

#### 1.   *Literal Infringement*

A finding of literal infringement requires a patentee to show "that each and every limitation set forth in a claim appear[s] in an accused product." *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004).  Infringement is a question of fact.  *Id.* at 1376. Summary judgment on the issue of literal infringement is appropriate "only 'when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device.'"  *Id.* (quoting *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001)); *Rodia Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005)

(same).  Applying this standard, the Court finds that the DC14 does not contain at least three of the limitations of claim 1, the only independent claim of the '315 patent, and Dyson is therefore entitled to summary judgment on the issue of literal infringement.

First, the DC14 does not contain a graspable arm that extends "at substantially a right angle with respect to the longitudinal axis" of the elongated handle of the cleaner.  As the Court determined above, this limitation requires that the point or points of the graspable arm that the user actually grasps when using the cleaner must be at or near a 90-degree angle relative to the longitudinal axis of the handle.

Dyson asserts that the graspable arm of the DC14 is at a 49-degree angle to the longitudinal axis of the DC14's handle.  *See* Fig. 4 (Dyson S.J. Mem. Illus. 2).  Dyson arrives at this number by measuring the angle between the straight, inner edge of the DC14's graspable arm and the longitudinal axis of the handle. Oreck counters that the study of its expert, Fereydoun Aghazadeh, establishes that the fingers of a DC14 user are actually at an angle of 74.3 degrees, not 49 degrees, to the longitudinal axis of the handle during use.  *See* Aghazadeh Aff. ¶ F & Ex. C.

The Court concludes that no reasonable jury could find that the DC14 contains the limitations of claim 1(e) of the '315

36



**_Fig. 4_** (Dyson S.J. Mem. Illus. 2)

patent, because no graspable portion of the DC14's arm is either at or near a 90-degree angle with respect to the longitudinal axis of its handle.  As an initial matter, because the relevant angle is between the graspable arm, not the user's fingers, and the longitudinal axis of the handle, Mr. Aghazadeh's measurements are simply not relevant to whether the DC14 infringes the '315 patent.  And as is illustrated in figure 4, Dyson's measurements show that the graspable portion of the DC14's arm is at an angle of approximately 49 degrees to the handle.[8]

Although Dyson's measurement is taken along the underside of the graspable arm, rather than through the center of the arm, a measurement taken through the arm itself would yield a substantially similar angle.[9]  Because the 49-degree angle of the DC14's graspable arm is not "substantially a right angle," the

---

[8]Although Oreck disputes the manner in which Dyson has measured the angle between the DC14's graspable arm and its handle, Oreck does not dispute that the angle measured by Dyson is, in fact, 49 degrees.

[9]Moreover, even were the Court to consider Oreck's earlier assertions that the arm of the DC14 actually extends at an angle of 65 degrees or 70 degrees, _see_ Brebner Decl. Exs. W, X, the Court would still find that no reasonable juror could determine that the DC14's arm is at "substantially a right angle" to the handle.

Court finds that no reasonable jury could find that the DC14 contains all of the limitations of claim 1(e) of the '315 patent.

Second, the DC14 does not contain a "base unit" as that term is used in the '315 patent.  The intrinsic evidence in this case makes it clear that a person of reasonable skill in the art would understand the term "base unit" in the '315 patent as the portion of an upright floor cleaner that houses its cleaning mechanism, including, in the case of an upright vacuum cleaner, the motor and the fan.  Claim 1 further requires that the base unit be supported by wheel means, and that it be mounted with a pivotable, elongated handle.  As even Oreck concedes, the DC14 employs a somewhat unusual[10] structure in which the motor and the fan are both housed separately from the brushbar, and they actually pivot with the handle.[11]  Thus, the DC14 does not have a base unit meeting the limitations of the '315 patent.

---

[10]*See* Oreck Claim Constr. Mem. at 5 n.4 ("The DC14 is a little unusual in that its motor and suction fan are not located within the nozzle assembly, as is customary.").

[11]Even were the Court to accept Oreck's proposed construction of the term "base unit" and find that the DC14 has a "base unit" consisting of the brushbar and its housing, Dyson might still prevail on this issue.  Claim 1(b) requires wheel means "adapted to support said base unit on said floor."  '315 Patent at 4:19-20.  But the DC14's "base unit," so-defined, is not supported directly by the wheel means.  Rather, it is attached to, and supported by, the engine housing, which, in turn, is supported by the wheel means.  Thus, the wheel means "support" the DC14's brushbar and its housing only indirectly.

38

Third, the graspable arm of the DC14 does not create a "strong wrist position" for the operator during use, as required by claim 1(f).  A "strong wrist position" is one in which the user's forearm, wrist, and hand are aligned and unlikely to bend. Because of the acute angle that the DC14's graspable arm forms with the longitudinal axis of the device's handle, the graspable arm is approximately parallel to the floor when the cleaner is in use.  *See* Dyson S.J. Mem. at 21 & Illus. 3.  Given this angle, a DC14 operator must bend his or her wrist to grasp the arm when using the cleaner.  Indeed, the photos attached to Oreck's own expert report actually confirm this.  In the photos, the operators' wrists appear to be roughly straight when grasping the Oreck device, but are noticeably bent when grasping the Dyson device.  *See* Aghazadeh Aff. Ex. D.  The Court therefore finds that the DC14 does not create a "strong wrist position" for the operator during use.

Because the DC14 does not satisfy each limitation of claim 1 of the '315 patent, and because every other claim in the '315 patent is dependent on claim 1, the DC14 does not literally infringe the '315 patent, and Dyson is entitled to summary judgment on the issue of literal infringement.

2.   *The Doctrine of Equivalents*

Although the DC14 does not literally infringe any of the
'315 patent's claims, Oreck can still prevail if it establishes
infringement under the doctrine of equivalents.  The doctrine of
equivalents permits a patentee to establish infringement when
there is no "substantial difference between the claimed invention
and the accused product." *Pall*, 66 F.3d at 1218.  In other
words, the doctrine "allows the patentee to claim those
insubstantial alterations that were not captured in drafting the
original patent claim but which could be created through trivial
changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722, 733 (2002).  As with literal infringement,
infringement under the doctrine of equivalents requires that the
allegedly infringing product contain each limitation or its
equivalent.  *Aquatex Indus., Inc. v. Techniche Solutions*, 419
F.3d 1374, 1382 (Fed. Cir. 2005) (citing *Warner-Jenkinson Co. v.
Hilton Davis Chem Co.*, 520 U.S. 17, 40 (1997)).

The application of the doctrine of equivalents can be
foreclosed by prosecution history estoppel.  Prosecution history
estoppel "'limits the doctrine of equivalents when an applicant
makes a narrowing amendment for purposes of patentability, or
clearly and unmistakably surrenders subject matter by arguments
made to an examiner.'"  *Id.* (quoting *Salazar v. Proctor & Gamble*

40

*Co.*, 414 F.3d 1342, 1344 (Fed. Cir. 2005)).  The existence of a narrowing amendment creates a presumption that the patentee surrendered the subject matter between the original clam and the amended claim.  *See Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1305 (Fed. Cir. 2005).  In addition, when a narrowing amendment takes the form of a new claim limitation, the Court presumes that the doctrine of equivalents is unavailable with respect to the new limitation.  *See id.*  The patentee has the burden of rebutting this presumptive surrender of equivalents, and it can do so by showing (i) that the equivalent in question was unforeseeable at the time of the amendment; (ii) that the rationale for the amendment is related only tangentially to the equivalent in question; or (iii) that there is "some other reason" why the patentee could not be expected to describe the equivalent in question.  *Festo*, 535 U.S. at 740-41.

In this case, Dyson argues that prosecution history estoppel prevents Oreck from asserting the doctrine of equivalents with respect to, *inter alia*, claim 1(e)'s limitation that the graspable arm extend "at substantially a right angle" to the longitudinal axis of the elongated handle, because that limitation was added as a narrowing amendment for patentability purposes.  Although Oreck disputes Dyson's contention that prosecution history estoppel applies here, it nevertheless

41

concedes that it has no claim under the doctrine of equivalents with respect to claim 1(e).  *See* Oreck Supp. Mem. at 15 ("Oreck agrees that 'equivalency' is not really an option here.").

The Court finds that Oreck is barred from invoking the doctrine of equivalents with respect to claim 1(e) by prosecution history estoppel.  The limitation that the graspable arm extend "at substantially a right angle" was added as an examiner's amendment on December 12, 1990, after the PTO had rejected Bissell's application on several occasions.  *See* Brebner Decl. Ex. BB(21).  While Oreck asserts that there is no indication that this amendment was either required for patentability or intended to narrow the claimed scope of the patent, a fair reading of the amendment and the prosecution history belies that claim.  First, the amendment is "narrowing" on its face.  Before the amendment, Bissell's application required only "a graspable arm extending generally laterally upwardly from the longitudinal axis" of the handle.  *See id.* Ex. BB(12).  There can be no doubt that the added phrase requiring that the arm extend "at substantially a right angle" narrowed the scope of the original claim.  Moreover, the prosecution history reveals that the reason for the amendment was likely to secure patentability over the prior art.  In its May 11, 1990 rejection of Bissell's application, the patent examiner stated that a graspable arm extending upwardly away from

42

the axis of the elongated handle would have been obvious in light
of the prior art.  *See id.* Ex. BB(17).  Thus, although the
prosecution history does not explicitly disclose the reason for
the narrowing amendment, it would at least appear that the
amendment was related to patentability.  In any event, as noted
above, the *Festo* presumption gives Oreck the burden of
establishing that prosecution history estoppel does not apply.
*See Biagro*, 423 F.3d at 1305.

As Oreck has made no effort to rebut the *Festo* presumption,
the Court finds that prosecution history estoppel bars Oreck from
asserting equivalence with respect to claim 1(e)'s limitation
that the graspable arm extend "at substantially a right angle."
Since the Court has already determined that the DC14 does not
literally contain this limitation, Oreck's inability to assert
that the DC14 contains its equivalent is necessarily fatal to *any*
claim of infringement.  *See Aquatex Indus.*, 419 F.3d at 1382
("Infringement under the doctrine of equivalents requires that
the accused product contain each limitation of the claim or its
equivalent.").  Accordingly, Dyson is also entitled to summary
judgment of noninfringement under the doctrine of equivalents.

## IV.  CONCLUSION

For the reasons stated above, the Court GRANTS Dyson's motion for summary judgment of noninfringement, and the Court DENIES Oreck's motion for summary judgment.

New Orleans, Louisiana, this  7th  day of June, 2006.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

44